Robert Y. Moffat and Grace S. Moffat, et al. [1] v. Commissioner. Moffat v. Commissioner
Docket Nos. 1664-64, 1665-64, 1671-64. .
United States Tax Court
T.C. Memo 1965-183; 1965 Tax Ct. Memo LEXIS 146; 24 T.C.M. (CCH) 961; T.C.M. (RIA) 65183; June 30, 1965
*146 David B. Buerger and William Y. Rodewald, 1800 Oliver Bldg., Pittsburgh, Pa., for the petitioners. Hobart Richey, for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax as follows: Docket
No.
Year
Deficiency
1664-64
1960
$510,688.90
1961
5,798.57
1665-64
1960
34,634.35
1671-64
1960
35,967.57
The parties have settled a number of their differences herein so that the issues remaining for decision are: (1) Did Robert, Sr.'s stock in Moffat Coal Company, Inc., become worthless in 1960? (2) Was the partial worthlessness of a debt owed to Robert, Sr., by Moffat Coal Company, Inc., deductible in 1960 as a business bad debt? (3) Are the partners of Moffat & Company entitled to deductions for 1960 representing the partial worthlessness of a debt due from Moffat Coal Company, Inc., resulting from the payment by the partnership of real estate taxes which the debtor had agreed, but failed, to pay? (4) Did Robert, Sr.'s stock in Moffat Fuel Corporation become worthless in 1960? Findings of Fact In each case the petitioners are husband and wife who filed joint returns *147 for the tax years on a cash basis. The Moffats filed their returns with the district director at Scranton, Pennsylvania, and the Comptons filed theirs with the district director at Pittsburgh, Pennsylvania. Robert, Sr., purchased large tracts of coal, surface lands and coal-mining structures and equipment in Lackawanna County, Pennsylvania, in 1953. Thereafter, at all times material hereto, he was actively engaged in the coal business in connection with the ownership and operation of those properties. He borrowed money secured by mortgages on the properties. Robert, Sr., in 1957 incorporated the part of his business actively devoted to coal-mining operations, but retained ownership of the coal and surface lands. Fidelity Trust Company of Pittsburgh agreed to lend the necessary funds because of its confidence in Robert, Sr. He transferred to Moffat Coal Company, Inc., a newly-organized Pennsylvania corporation, all of the structures, equipment, inventories and accounts receivable of his coal business. The adjusted basis of the assets so transferred, less the indebtedness, was $880,000. Moffat Coal Company, Inc., then issued its capital stock, 58,000 shares to Robert, Sr., and 30,000 *148 shares to eighteen key employees of his business whose services he wanted to reward and retain. None of the eighteen key employees was related to Robert, Sr., except his son, Robert, Jr., who received 1,000 shares. Each of these eighteen persons executed a promissory note to Robert, Sr., to pay for the stock at $10 per share. No payments were made on the notes. They were cancelled and the shares were taken by Robert, Sr., in 1961. No dividend was ever paid on the stock. Robert, Sr., leased the coal and surface lands owned by him to Moffat Coal Company, Inc., for a term of 51 years for a royalty of 50" per ton of coal mined and all taxes assessed against the coal and surface lands. This rental was common for such coal lands in the area at the time. The lease was amended on October 29, 1957 to provide that the royalty of 50" per ton was to be paid only if the lessee was able to make the payment. Fidelity Trust Company loaned Moffat Coal Company, Inc., $750,000 secured by a first mortgage on its structures and equipment. The money was used to discharge a $750,000 unsecured debt of Robert, Sr., subject to which the property had been transferred. Robert, Sr., remained personally liable *149 on a $2,500,000 mortgage then held by Fidelity Trust Company secured by the coal and surface lands leased to Moffat Coal Company, Inc., and in connection with that mortgage Fidelity Trust Company received from Robert, Sr., a financing statement pledging all of his claims for money due in connection with a condemnation of some of his coal lands for a portion of the Pennsylvania Turnpike near Scranton. Moffat Coal Company, Inc., borrowed $300,000 from Fidelity Trust Company on December 10, 1957 on a line of credit which was gradually increased later. The petitioner and his two children, petitioners herein, organized Moffat & Company, a partnership, on January 2, 1958, in which Robert, Sr., had a 60 percent interest and each of his children had a 20 percent interest. Robert, Sr., contributed to the partnership all of the coal and surface lands then owned by him (exclusive of the expected award from the Pennsylvania Turnpike Commission) subject to the mortgages and leases thereon. The two children contributed to the partnership a second mortgage on Robert, Sr.'s coal and surface lands which they owned and on which the unpaid principal amounted to $395,451. Robert, Sr., was chairman *150 of the board and principal stockholder of Moffat Coal Company, Inc., at all times material hereto. The partnership and Moffat Coal Company both kept their books and filed their income tax returns on an accrual method of accounting. The Fidelity Trust Company was merged into Pittsburgh National Bank in September 1959 and, upon request of the new national bank, Robert, Sr., delivered to it a written agreement that his expected award from the Pennsylvania Turnpike Commission would be security for any current indebtedness of Moffat Coal Company, Inc., to the bank. The award under the condemnation for the Pennsylvania Turnpike was made on July 3, 1960 in the amount of $1,195,000. A conditional advance on the award had been made in 1959 and the balance of the award was paid in full in 1960. Robert, Sr., gave his check for $200,000 to Moffat Coal Company, Inc., on February 4, 1960 and the check was delivered to Pittsburgh National Bank. The $200,000 was entered on the books of Moffat Coal Company, Inc., as a loan payable to Robert, Sr., secured by the company's demand promissory note. Later in 1960, Robert, Sr., gave checks for a total of $180,000 to the company, which then paid those *151 amounts to the bank and gave its demand promissory notes to Robert, Sr., as security for the loans. Pittsburgh National Bank demanded on August 8, 1960 that Moffat Coal Company, Inc., pay $420,000 on its indebtedness and that same month demanded that Robert, Sr., as pledgor of his award from the turnpike condemnation, pay $420,000. Robert, Sr., in compliance with this demand, paid the bank the amount demanded on August 25, 1960, after which Moffat Coal Company, Inc., still owed the bank $957,526 secured by its mortgage above described. Robert, Sr., claimed $800,000 on his 1960 income tax return as a bad debt due from Moffat Coal Company, Inc. The Commissioner in his notice of deficiency disallowed the deduction. Moffat Coal Company, Inc., had developed and equipped the leased coal properties by the close of 1959 sufficiently to produce 1,500,000 tons of coal per year. It was necessary in the operation of the mines to pump out water which constantly accumulated therein. The Moffat mines adjoined those of Hudson Coal Company, which operated pumps for the benefit of both properties. Moffat Coal Company, Inc., paid a part of those pumping expenses. The annual pumping costs of the *152 Moffat mines amounted to about $700,000 and those of Hudson amounted to about $800,000. Hudson Coal Company notified Moffat Coal Company, Inc., on April 26, 1960, that it would discontinue pumping on November 1, 1960 because the cost of pumping made its mining unprofitable. This meant that Moffat Coal Company, Inc., if it was to continue mining, would have to increase its pumping costs by the amount previously spent by Hudson for pumping. Thereupon Moffat Coal Company, Inc., and the partnership decided that its pumping operations would have to be discontinued and large portions of mines would have to be abandoned. Hudson discontinued its pumping operations on November 1, 1960. The mines then quickly filled with water during 1960, creating an underground lake beneath the city of Scranton and suburbs which was about 11 miles long, 4 miles wide and 600 feet deep. The water rose more quickly than was anticipated. Moffat Coal Company, Inc., successively abandoned most of its mines as the water level rapidly rose. Such machinery and equipment as could be removed profitably was removed, but much of it had to be abandoned. About 85 percent of the machinery and equipment was abandoned, scrapped *153 or rendered useless during 1960. The number of employees of Moffat Coal Company, Inc., permanently declined from 3,000 to 300. Approximately 26,000,000 tons of the 30,000,000 tons of developed coal reserves owned by the partnership before the termination of pumping were flooded during 1960 and were rendered permanently inaccessible and worthless. Moffat Coal Company, Inc., had insufficient funds and failed to pay the real estate taxes for several years assessed against the coal and surface lands of which it was then lessee and the local taxing authorities demanded in 1960 that the partnership, as owners of those properties, pay those taxes. A suit for the taxes was entered against the partnership, which upon advice of counsel, paid those taxes in the amount of $422,319 in the latter part of 1960 and the partners deducted their shares of that amount on their returns for 1960. The Commissioner in determining the deficiencies disallowed the deductions. "The parties agree that Moffat & Company is entitled to deduct an amount equal to the taxes so paid, to the extent that its claim for reimbursement therefor from Moffat Coal Company, Inc., had no value in 1960." Sixty-eight percent *154 of its claim for reimbursement from Moffat Coal Company, Inc., had no value in 1960. Moffat Coal Company, Inc., continued to operate at a loss for some time after 1960 in an effort to keep the remaining lands belonging to the partnership salable. The stock of Moffat Coal Company, Inc., became worthless in 1960 and debts of that company due its general creditors, including the amout due Robert, Sr., became worthless during that year to the extent of 68 percent. Robert, Sr., had organized the Moffat Fuel Corporation in 1954 to sell coal mined by him. He acquired all of its stock but transferred a portion of that stock to Moffat Coal Company, Inc., when he transferred his operating properties to it. Moffat Fuel Corporation, in order to operate profitably, had to have a large amount of coal to sell, and when the flood closed down the mines it did not have sufficient coal to enable it to operate at a profit. It had had losses in and prior to 1960. A decision was reached in 1960 to dissolve the company and steps were taken to carry out that decision. It was liquidated in 1961 and all of its assets were used to pay creditors. The stock of Moffat Fuel Corporation became worthless in *155 1960. Robert, Sr., arranged for the loans which were made by banks to Moffat Coal Company, Inc., and the obligations which he assumed and paid on account of or for the benefit of Moffat Coal Company, Inc., were directly related to his business of owning coal and surface lands and having those properties operated for profit either by himself or by the Moffat Coal Company, Inc., during the time that he or the partnership owned the properties. His business during this period included his activities in seeing that the mining operations of Moffat Coal Company, Inc., on the properties were conducted efficiently so that he or his partnership could receive as much financial benefit as possible from those operations. All stipulated facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The facts established by the evidence introduced in this case, including those stipulated, leave little for decision. The parties have settled some other matters on which they previously disagreed. Decision of the first issue depends upon whether Robert, Sr.'s stock in Moffat Coal Company, Inc., became worthless in 1960. The Commissioner argues that it did not because the company continued *156 to mine coal after 1960. However, the permanent flooding of the mines terminated its prospects of profit. The owners hoped to sell their remaining coal lands, felt that closing of the mines would preclude such sales and continued the limited operations of the company at the cost of the anticipated losses. The value of the free assets of the company was only 32 percent of the amount which it owed general creditors at the end of 1960. The evidence as a whole supports Robert, Sr.'s contention and a finding has been made that the stock became worthless in 1960. The basis for the stock is not in dispute. The amount of the debt involved in the second issue is not in dispute. The evidence shows and a finding has been made that it became worthless in 1960 to the extent of 68 percent. The Commissioner argues that it was a nonbusiness debt, not a business debt, and therefore its partial worthlessness can not be deducted by Robert, Sr., for 1960. The evidence clearly shows, however, that Robert, Sr., was very actively and constantly engaged in the business of owning, leasing and seeing to the proper operation of his coal lands at all times material hereto, first as sole owner and later as a *157 60 percent partner in Moffat & Company. His guarantee of the Moffat Coal Company borrowing as well as his payment of the indebtedness in 1960 were not only proximately but directly related to that business. He organized that company in 1957 to reward and retain the services of eighteen key employees. It had to borrow money. Robert, Sr., had to guarantee the repayment of the loans to it and he had to make the payments involved in this issue. He was chairman of the board and really the only stockholder of the debtor corporation. The argument that this debt was not a business debt is refuted by the evidence presented. Moffat Coal Company, Inc., had agreed in the lease to pay taxes on the leased real estate but failed to pay those assessed for 1958, 1959 and 1960 because of lack of funds. The partnership paid them, on advice of counsel, to settle a suit, thus creating the recognized debt due from Moffat Coal Company, Inc. The parties agree that the partnership is entitled to deduct the debt for 1960 to the extent of its worthlessness in that year. The evidence shows and a finding has been made that this debt became worthless in 1960 to the extent of 68 percent. It follows that the three *158 partners are entitled to deduct their shares of this partnership deduction. The final issue requiring decision is whether Robert, Sr.'s stock in Moffat Fuel Corporation became worthless in 1960. It admittedly was worthless and the company was dissolved shortly thereafter. This company was engaged in selling the coal from the Moffat mines. The flooding of those mines in 1960 reduced the possible production from them to such a small tonnage that the persons involved in the selling of the coal fully realized in 1960 that the expenses of their company would far exceed its income if it continued in business. The decision was therefore made late in 1960 to terminate and liquidate the company. All employees and others to be affected were notified in 1960 of this decision. Steps leading to the liquidation were taken in 1960. The company needed all of its assets to pay its debts and had nothing for its stockholders. Moffat Coal Company, Inc., entered into a contract with an unrelated broker to sell its coal. A fair preponderance of the evidence shows and a finding has been made that the stock of Moffat Fuel Corporation became worthless in 1960. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: James F. Compton and Grace M. Compton, Docket No. 1665-64; Robert Y. Moffat, Jr., and Constance K. Moffat, Docket No. 1671-64.↩